**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3470

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DAVIS and TERRANCE "TJ" MCDONALD, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:24-cv-8410 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMAND** |
| THE CHARLES SCHWAB CORPORATION and CHARLES SCHWAB & CO., INC., | |
| Defendants. | |

# I.    <u>INTRODUCTION</u>

1.      This class action arises out of Charles Schwab's drastic under-payment of interest to its own customers in its cash sweep program.  Charles Schwab underpaid its customers in violation of its fiduciary and contractual duties in order to enrich itself at its customers' expense.  Rather than pay its customers a "reasonable" rate of interest on their cash as it was required to do, Charles Schwab instead paid miniscule rates to its customers, while it earned hundreds of millions of dollars on that cash due to rising interest rates.

2.      In a typical cash sweep program for a brokerage customer, the brokerage firm moves uninvested cash from a customer's brokerage account into an interest-bearing account that generates returns for the client.  When Charles Schwab sweeps its customers' cash into its cash sweep program, Charles Schwab uses that cash to generate outsized returns for itself, due to the spread between the interest income that Charles Schwab earns on the cash in high interest rate environments, and the amount of interest that it pays its clients.

3.      Charles Schwab is required to act as a fiduciary in the best interests of its clients.  That includes a duty to put its customers' interests ahead of its own when recommending and making investments for them.  In addition, under the law, the agreement between Charles Schwab and its clients carries with it an implied covenant of good faith and fair dealing.  That includes an implied promise that neither party will do anything to frustrate the fruits of the customers' bargain with Charles Schwab.

4.      Rather than act as a fiduciary in the best interests of Charles Schwab's account holders, or fulfill its contractual and implied covenant obligations to its customers, Charles Schwab used its customers' funds to enrich itself at the expense of its own clients.

5.      Rising interest rates presented an opportunity for Charles Schwab customers to earn more on their cash sweep account balances.  By improperly

keeping the interest rates paid on cash sweep accounts low, Charles Schwab usurped that opportunity for itself, leveraging its own clients' cash for its own benefit and earning near-guaranteed outsize returns year after year.

6.    For example, the yield on short-term U.S. Treasury bills increased dramatically over the past two years, and it has been above 5.25% for most of the past year. By contrast, as of September 2024, Charles Schwab paid customers with cash sweep accounts an interest rate of only 0.20%. That is ***over 23 times less*** than the current short-term Treasury Bill yield.

7.    There is nothing "reasonable" or "fair" about those rates, or about Charles Schwab using its clients' cash balances to reap windfall profits at these disproportionate spreads. In stark contrast, Fidelity—a Charles Schwab competitor—automatically sweeps uninvested cash in its clients' brokerage accounts into a money market fund currently earning approximately 5%. Charles Schwab's misconduct was a breach of its fiduciary duties, a breach of its contracts with retirement and other benefit plan account holders, and a breach of the implied covenant of good faith and fair dealing.

8.    Plaintiffs, individually and on behalf of the proposed Class defined herein, bring this class action to remedy the significant financial harm caused by Charles Schwab's use of its cash sweep program to enrich Charles Schwab at the cost of its own clients.

## II.    JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over Plaintiffs' and the Class's claims pursuant to the Class Action Fairness Act, including section 28 U.S.C. § 1332(d). The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiffs and other class members are a citizen of States different from the Defendants.

10.    This Court has personal jurisdiction over Defendants because they conduct substantial business in this District and have their principal places of business here.

11.    Venue is proper in this District under 28 U.S.C. § 1391(b).

### III.    PARTIES

#### A.    Plaintiffs

12.    Plaintiff Michael Davis is a citizen of Maryland, who maintained a retirement account with Defendant Charles Schwab & Co, Inc., which is a registered investment advisor, as well as a brokerage account.  The cash balances in his accounts were, at times, swept into Charles Schwab's Cash Features Program.

13.    Plaintiff Terrance "TJ" McDonald is a citizen of Illinois, who maintained a retirement account with Defendant Charles Schwab & Co, Inc., which is a registered investment advisor.  The cash balances in his account were, at times, swept into Charles Schwab's Cash Features Program.

14.    Michael Davis and TJ McDonald are referred to collectively herein as "Plaintiffs."

#### B.    Defendants

15.    Defendant The Charles Schwab Corporation is a Delaware holding corporation with its principal place of business in Westlake, Texas.  Through its operating subsidiaries, The Charles Schwab Corporation provides a full range of brokerage, banking, and financial advisory services.

16.    Defendant Charles Schwab & Co., Inc. is a California corporation with its principal place of business in Westlake, Texas.  It is the wholly-owned broker-dealer subsidiary of The Charles Schwab Corporation.

17.    The Charles Schwab Corporation and Charles Schwab & Co., Inc. are referred to collectively herein as "Charles Schwab" or "Defendants."

### IV.    FACTUAL ALLEGATIONS

#### A.    Charles Schwab's Cash Sweep Programs

18.     Net interest income is the difference between how much interest banks earn on loans and investments, and how much they pay out to depositors.  Charles Schwab is motivated to increase its net interest income by depressing the value of the interest that it pays to its customers, while taking advantage of the interest Charles Schwab itself earns on higher rates paid on the customer cash that is held at Charles Schwab.

19.     Charles Schwab has different cash sweep programs under Charles Schwab's Cash Features Program: (i) the Bank Sweep program for retail brokerage accounts; (ii) the Bank Sweep for Benefit Plan for retirement and other benefit plan accounts; (iii) the Schwab One® Interest Feature; and (iv) the Money Fund Sweep Feature.  Collectively, these are referred to herein as the "Cash Features Program."

20.     Charles Schwab's Cash Features Program sweeps customer cash to interest-bearing deposit accounts at banks that are affiliated and unaffiliated with Charles Schwab, including Charles Schwab Bank, SSB; Charles Schwab Premier Bank, SSB; Charles Schwab Trust Bank; TD Bank, N.A.; and TD Bank, USA, N.A. When funds in a customer's account are first available for deposit into deposit accounts at an affiliated bank, Charles Schwab, as the customer's "***agent***," will open two deposit accounts on the client's behalf at the bank: a demand deposit account ("DDA") and a money market deposit account ("MMDA").  After Charles Schwab opens the deposit accounts, it deposits the "Free Credit Balances that accrue" in the client's account "from time to time" into the deposit accounts.

21.     In addition, if a client's cash exceeds the $250,000 FDIC limit at each of the client's assigned affiliated banks, the excess amount will be deposited into the "Excess Bank," which is Charles Schwab Bank.  Regardless of whether the banks are affiliated or unaffiliated with Charles Schwab, the interest rates paid to Charles Schwab customers are determined by the fees that Charles Schwab charges the banks.  For both the Bank Sweep and Bank Sweep for Benefit Plans programs, the affiliated banks "pay the same interest rate on the DDA and MMDA."

22.    Charles Schwab has control and discretion over the specific banks to which it sweeps customers' cash.  All "instructions regarding the movement of [a client's] funds in the Bank Sweep and Bank Sweep for Benefit Plans Features must be provided by" Charles Schwab to the banks, "and information concerning the Bank Sweep and Bank Sweep for Benefit Plans Features may only be obtained from" Charles Schwab.  Moreover, the banks "will not accept instructions directly from" the client with respect to the client's "Deposit Accounts held through the Bank Sweep and Bank Sweep for Benefit Plans Features nor provide" the client "directly with information concerning these Cash Features."  Finally, Charles Schwab "can, at its discretion and upon written notice, terminate your use of the Bank Sweep or Bank Sweep for Benefit Plans Feature."

23.    Charles Schwab controls and has discretion over: (a) the characteristics and parameters of each of the available Cash Features Program options (Bank Sweep and Bank Sweep for Benefit Plans Features); (b) the banks in which customers' swept cash is deposited, including for any cash that exceeds FDIC limits; (c) the rates of interest actually paid to customers on their Cash Features Program deposits (including because Charles Schwab sets the annual per account flat fee charged to the affiliated and unaffiliated banks, which "reduces the amount of interest" the banks are willing to pay to customers); and (d) the termination of a client's use of the Bank Sweep or Bank Sweep for Benefit Plans Feature.

24.    Due to Charles Schwab's control and discretion over customers' cash sweep holdings and the returns on such holdings, Charles Schwab owes a fiduciary duty to all of its customers with cash in sweep accounts, which includes a duty to act in their best interests, and to place such best interests ahead of Charles Schwab's own self-interest.  Charles Schwab breached that fiduciary duty when it swept client cash into Cash Features Program vehicles that paid customers unreasonably low interest rates.

**B.    Charles Schwab's Duties to Its Clients**

25.     Charles Schwab & Co., Inc. is a registered investment advisor bound by the fiduciary duties imposed on it by the Investment Advisors Act of 1940, including duties of care and loyalty.  This includes a duty for Charles Schwab & Co., Inc. to act in the best interests of its clients, and to place the best interests of its customers ahead of its own self-interest.  Similar duties are imposed on Charles Schwab under principles of broker-dealer law.

26.     Charles Schwab & Co., Inc. has an investment advisor relationship with the members of the Class.  Charles Schwab & Co., Inc. has discretion over the amount of interest secured or paid to its customers.

27.     In addition, Charles Schwab & Co., Inc. also acts as an agent for its customers.  The Cash Features Disclosure Statement provides that Charles Schwab & Co., Inc. "is ***acting as your agent*** in establishing the Deposit Accounts with the [affiliated banks] and in depositing and withdrawing funds."  The Schwab Brokerage Account Agreement and the Schwab IRA and ESA Account Agreement each state, under the heading "Sweep Procedures for the Bank Sweep, Bank Sweep for Benefit Plans, and Money Fund Sweep Features," that "***You authorize us to act as your agent to make deposits to and withdrawals from deposit accounts at one or more banks*** or purchase and sell shares in a Schwab® Sweep Money Fund in accordance with the Cash Features Program Disclosure Statement."

**C.     Charles Schwab Is Contractually Obligated to Pay a Reasonable Rate of Interest on Retirement and Other Benefit Plan Accounts**

28.     Charles Schwab entered into account agreements with Charles Schwab customers.  The account agreements, including the Schwab IRA and ESA Account Agreement and the Schwab Retirement Plan Brokerage Account Agreement, provide that the Bank Sweep Program is governed by the terms and conditions set forth in the Cash Features Disclosure Statement.  Pursuant to the Cash Features Disclosure Statement, Charles Schwab retirement and other benefit plan customers and Charles Schwab agree that "***Retirement and other benefit plan accounts will be***

*paid a reasonable rate consistent with applicable legal and regulatory requirements*."

29.    Accordingly, Charles Schwab has explicitly agreed to pay a "reasonable rate of interest" on the cash sweep accounts of their retirement and other benefit plan account clients.

30.    This contractual obligation is in conformity with Internal Revenue Code Section 4975, the provisions of which apply to Charles Schwab's IRA accounts.  Specifically, Internal Revenue Code Section 4975 taxes "prohibited transactions," including when an IRA plan sponsor engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. § 4975(c).

31.    A "disqualified person" includes those "providing services to the plan." 26 U.S.C. § 4975(e)(2)(B).  This would include a bank that holds client assets and an advisory firm that determines which bank will hold those assets, including Charles Schwab.

32.    One safe harbor to the taxation of prohibited transactions is "the investment of all or part of a plan's assets in deposits which bear a *reasonable interest rate* in a bank or similar financial institution."  26 U.S.C. § 4975(d)(4). These provisions explicitly target situations where a firm might attempt to benefit from holding its client funds by paying them unreasonably low interest rates, and they are instead required to pay a "reasonable interest rate."  Accordingly, under 26 U.S.C. § 4975, Defendants were required to pay a reasonable interest rate to retirement account clients.

33.    In the context of accounts governed by 26 U.S.C. § 4975(c), the U.S. Department of Labor defined a "reasonable rate" by considering fair market rates and similar benchmarks, including "short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by

reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills)."

34.    The U.S. Treasury regulations include a similar requirement where Charles Schwab "invests plan assets in deposits in itself or its affiliates."  26 C.F.R. § 54.5975-6(b)(3)(i).  In those circumstances, the parties' agreement "must name" the bank and "state that [the bank] may make investments in deposits which bear *a reasonable rate of interest* in itself (or in an affiliate)."  *Id.*

35.    In sum, federal law requires that Charles Schwab pay its retirement account clients a "reasonable" interest rate.

**D.    Charles Schwab's Cash Sweep Contracts Include an Implied Covenant of Good Faith and Fair Dealing**

36.    Under California law—which governs Charles Schwab customers' agreements regarding their cash sweep accounts—all contracts contain an implied covenant of good faith and fair dealing, which encompasses any promises which a reasonable person in the position of the promisee would be justified in understanding were included.

37.    This implied covenant includes a pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

38.    The Cash Features Disclosure Statement includes the following term: "For both the Bank Sweep and Bank Sweep for Benefit Plans Features, the Program Banks will pay the same interest rate on the DDA and MMDA. *Interest rates on the Deposit Accounts may be established at a rate as low as possible consistent with prevailing market and business conditions.*"  This term indicates that there is a linkage between the interest rate paid on Charles Schwab cash sweep accounts and "prevailing market and business conditions" and that, in a high interest rate environment, the interest rate paid out to clients in cash sweep accounts will reflect those prevailing market and business conditions.  The provision that the rate will be

"as low as possible" is expressly limited by the requirement that the rate must be "consistent" with such conditions.

39.    Class members' claim under the breach of the implied covenant of good faith and fair dealing is brought solely on behalf of individuals who do not have a contractual right expressly providing for Charles Schwab's payment of a "reasonable rate" of interest on the cash sweep balances of "retirement and other benefit plan accounts."  Such claim is brought on behalf of non-advisory and non-retirement account retail customers of Charles Schwab (the "Non-Retirement Account Subclass").  Accordingly, the conduct and resulting injury alleged by the Non-Retirement Account Subclass is not identical to, and such claim is not duplicative of, any asserted contractual claim on behalf of those Subclass members.

**E.    Charles Schwab Breached Its Fiduciary Duties, Contractual Obligations, and the Implied Covenant of Good Faith and Fair Dealing, and Thereby Profited At Its Clients' Expense**

40.    Charles Schwab breached and continues to breach its duties to secure reasonable interest rates for its clients' deposits, its contractual obligations, and the implied covenant of good faith and fair dealing, because the interest paid on its clients' cash deposits was and is not reasonable, and the so-called "fee" it extracted for itself was not reasonable.

41.    Below is a chart of exemplary interest rates paid on "uninvested cash" in a client's "Schwab brokerage and retirement accounts":

| Approximate Dates | Interest Rate |
|---|---|
| November 2021 through June 2022 | 0.01% |
| June 2022 through August 2022 | 0.15% |
| August 2022 through October 2022 | 0.25% |
| October 2022 through January 2023 | 0.40% |
| January 2023 through | 0.45% |

| September 19, 2024 | |
|---|---|
| September 20, 2024 through present | 0.20% |

42.    As set forth above, from as far back as November 2021 through the present, Charles Schwab paid as little as .01% in interest, and only up to .45%, with that rate falling back to .20% starting in September 2024.

43.    The U.S. Department of Labor has provided the following definition of a "reasonable" rate of interest:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

68 Fed. Reg. 34646, 34648 (2003).

44.    The Internal Revenue Service similarly defines an "arm's-length interest rate" as:

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances.

26 C.F.R. § 1.482-2(a)(2).

45.    Under these terms, and any prudent understanding of what a "reasonable" rate of interest is, Charles Schwab did not secure or pay a reasonable rate of interest to its customers, including Plaintiffs and Class members.  This is supported by reference to other leading indicators of interest rates being paid during this time period.

### 1.    The Federal Funds Rate Benchmark

46.    The Federal Funds Rate benchmark demonstrates that the interest rate paid to Charles Schwab cash sweep accountholders was not reasonable.  The federal funds market consists of domestic unsecured borrowings by depository institutions

from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, it is the market of unsecured borrowing transactions, principally between banks.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions.

47.    The Federal Funds Rate increased dramatically in recent years, with an effective rate of 5.33% as of August 28, 2024, for example.  The chart below shows



the stark and prolonged increase in the Federal Funds Rate over the past several years.  By contrast, the interest rate paid to Charles Schwab cash sweep account holders has been drastically lower:

**2.    The Interest Rates on Sovereign Short-Term Debt Benchmark**

48.    The yield on short-term U.S. Treasury Bills also demonstrates that the interest rate paid on Charles Schwab cash sweep accounts was not reasonable.  U.S. Treasury Bills are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks.  They are sold at a discount

to their face value, and when they mature, the investor is paid the face value. Treasury Bills are considered safe investments, but they generally do not produce high returns over time, especially in a low-interest-rate environment.

49.    The yield on a U.S. Treasury Bill is the interest rate that the U.S. government pays to borrow money for a set period of time, expressed as a percentage. As shown in the graph below, over the past several years, the yield on the shortest term (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately 5.5% in mid-2023, and has remained at that level through August 2024:



**Yield Curve**

During this timeframe, the interest rate Charles Schwab paid to cash sweep account holders remained a tiny fraction of that benchmark.

### 3.    Other Institutions' Sweep Account Interest Rates

50.    Other firms that swept cash to unaffiliated banks paid interest rates that more closely resemble arm's-length negotiations, and therefore more closely reflect

the prevailing business and market conditions, than the rates paid by Charles Schwab.

51.    For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and they have consistently paid significantly higher rates of interest than Charles Schwab.  At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of asset tier, and R.W. Baird paid between 1.58% interest (on cash balances up to $1 million) and 3.08% interest (on cash balances above $5 million).  Charles Schwab, in contrast, paid 0.40% on all cash balances as of year-end 2022.

52.    Additional examples include Robinhood's rate of 4.9% for Robinhood Gold members as of July 27, 2023, and WeBull's rate of 5%.

53.    Similarly, Fidelity and R.W. Baird have significantly increased the rates they paid on swept cash.  As of January 12, 2024, Fidelity paid 2.69% interest on cash balances regardless of asset tier, and R.W. Baird paid between 2.03% interest (on cash balances up to $1 million) and 4.11% interest (on cash balances above $5 million).  In comparison, as of January 2024, Charles Schwab paid only 0.45% on all cash balances.

54.    In addition, the interest rate offered by Vanguard on its sweep program is 4.15% regardless of asset tier.

55.    As these data show, other brokerage and advisory financial institutions that have cash sweep programs pay or secure significantly higher interest rates than Charles Schwab.

### 4.    Money Market Rates

56.    Money market rates are another benchmark for determining a "reasonable rate."  Crane's Retail Money Fund Index, for example, cited market rates of 4.85% as of August 31, 2024.  Charles Schwab offers money market funds to its customers, including money market funds that offer 7-day yields of 4.88% or 5.73% as of September 27, 2024.

### 5.    The Interest Rate Applicable to Short-term Instruments Such as Repurchase Agreements

57.    The prevailing interest rates applicable to short-term instruments such as repurchase agreements from 2021 to the present were also significantly higher than Charles Schwab's cash sweep account interest rates.

58.    A repurchase agreement (also known as a "repo") is a short-term lending instrument that involves the sale and repurchase of securities.  In a repo, a borrower sells a security to a lender, usually a bank or securities dealer, and agrees to buy it back at a specified date and price.  The price is typically higher than the original sale price, reflecting the interest charge for borrowing over the period.  The security serves as collateral for the lender.  A repo can be based on any security, but they usually involve government debt or other debt instruments with steady values.

59.    The overnight repo rate is the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs.  From April of 2023 through April of 2024, for example, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to as high as 5.55% in December 2023.  These rates are significantly higher than the cash sweep interest rates offered by Charles Schwab.

### F.    Charles Schwab Was Unjustly Enriched by Its Misconduct

60.    Charles Schwab derives significant financial benefits at the direct cost of its clients by keeping the interest rates for its cash sweep accounts artificially low, while it earns higher interest rates on those deposits.

61.    Charles Schwab benefits financially from cash balances held in the Bank Sweep and Bank Sweep for Benefit Plans programs through the "spread" that its affiliated banks earn on deposits and the annual fees that Charles Schwab receives from affiliated and unaffiliated banks.

62.    An example of the partial benefit to Charles Schwab derived from the setting of cash sweep interest rates on cash sweep accounts is reflected by the

massive growth of its net interest revenue from 2021 to present.  Between 2021 and 2023, Charles Schwab's net interest revenue increased *17%* from $8 billion to $9.4 billion.

## V.    CLASS ACTION ALLEGATIONS

63.    Plaintiffs re-allege and incorporate by reference the allegations set forth above.  Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this class action individually, and seek certification of the Class of all retail clients of Charles Schwab who had cash deposits in Charles Schwab's Cash Features Program.

64.    Plaintiffs also seek certification of a Subclass of Charles Schwab retail clients who held retirement and other benefit plan accounts with Charles Schwab, but had cash deposits in Charles Schwab's Cash Features Program (the "Retirement Plan Subclass").

65.    Plaintiffs also seek certification of a Subclass of Charles Schwab retail clients who did not have retirement and other benefit plan accounts with Charles Schwab, but had cash deposits in Charles Schwab's Cash Features Program (the "Non-Retirement Plan Subclass").

66.    Excluded from the Class are Defendants, including Charles Schwab and any of its affiliates, and their officers and directors.

67.    The Class members are so numerous that their individual joinder is impracticable.  Charles Schwab has thousands of customers nationwide, including retirement plan and non-retirement plan customers.  The Class and Subclasses thus satisfy the numerosity requirement of Federal Rule 23.

68.    Once certified, Class members may be notified of the pendency of this action by customary means pursuant to the requirements of due process, including via mail, media publication, electronic communication, or other appropriate means and methods.

69.    Common questions of law and fact also exist and predominate with respect to the claims of all members of the Class and Subclasses. These common questions of law and fact include the following:

a) The terms and scope of Charles Schwab's duty to members of the Class, and the extent to which Charles Schwab breached that duty;

b) Whether the interest rates paid by Charles Schwab on its Cash Features Program are reasonable;

c) Whether Charles Schwab breached the contractual terms of its retirement and other benefit plan programs with members of the Retirement Plan Subclass;

d) Whether Charles Schwab breached the implied covenant of good faith and fair dealing with members of the Non-Retirement Plan Subclass;

e) Whether Charles Schwab was unjustly enriched by its wrongful conduct;

f) Whether Charles Schwab committed gross negligence;

g) The extent to which Class members, including Subclass members, are entitled to damages or other monetary relief; and

h) Whether and to what extent Plaintiffs and Class members are entitled to the award of attorneys' fees and the reimbursement of litigation expenses.

70.    Plaintiffs' claims are typical of the claims of the other members of the Class and the Subclasses and because they were all Charles Schwab retail account holders to whom Charles Schwab paid an unreasonably low interest rate on their cash sweep account holdings. Plaintiffs' claims are typical of the claims of the other members of the Class and Subclasses because they arise from the same cash sweep program and misconduct by the Defendants. In addition, the relief sought by members of the Class and Subclasses is common to such members.

71.     Plaintiffs will fairly and adequately protect the interests of Class and Subclass members.  Plaintiffs have retained skilled counsel who are experienced in the prosecution of complex class action litigation.

72.     Plaintiffs have no interests that are adverse to the interests of the members of the Class or Subclasses.

73.     A class action is a superior vehicle for the present dispute compared to all other available means to redress the claims of Plaintiffs and the other members of the Class and Subclasses.  The financial harm that each individual Class member has suffered is small relative to the cost and burden required for each Class member to individually litigate his or her claims against the Defendants.  Absent certification of this case as a class action, it would be virtually impossible for individual Class members to obtain effective redress for the wrongs alleged herein.

74.     Superiority is further satisfied here, where the law of California will apply to all state law claims under the terms of Charles Schwab's contracts with its customers.

## VI.    PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT ONE

**Breach of Fiduciary Duty**
**Brought on behalf of the Class Against All Defendants**

75.     Plaintiffs, individually and on behalf of the Class, hereby re-allege the allegations set forth above as if fully set forth herein.

76.     Defendants owed fiduciary duties to the Class due to Defendants' exercise of control and discretion over Plaintiffs' and other Class members' financial holdings.

77.     Defendants' duties to Plaintiffs and the members of the Class included (i) a duty of care; (ii) a duty of loyalty to their clients; and (iii) a duty to act in the best interest of their clients, including by placing the interests of their clients ahead of their own best interests.

78.     As set forth above, Defendants breached their duties to the clients when they (i) allocated clients' cash into sweep accounts that benefited Charles Schwab's interests above their clients' interests; and (ii) set and paid an unreasonably low rate of interest on clients' cash sweep accounts through Charles Schwab's collection of unreasonable fees.

79.     Defendants' past and ongoing breaches of their fiduciary duties to Plaintiffs and the Class members damaged Plaintiffs and the Class because they failed to earn a reasonable rate of return on their cash balances while the benefit that accrued to Charles Schwab damaged Plaintiffs and the Class.

80.     Accordingly, Plaintiffs, individually and on behalf of the Class, seek all damages permitted by law.

## COUNT TWO

### Unjust Enrichment
### Brought on behalf of the Class Against All Defendants

81.     Plaintiffs, individually and on behalf of the Class, hereby re-allege the allegations set forth above as if fully set forth herein.

82.     Defendants' wrongful conduct caused Plaintiffs and the other members of the Class to receive unreasonably low interest payments on their cash sweep deposits and Defendants derived the benefit of such under-payment in the form of net interest income, fees and other financial benefits.

83.     As a result, Defendants were unjustly enriched by their misconduct, and Plaintiffs and the other members of the Class conferred a benefit upon Defendants because they received significantly greater net interest income than they otherwise would have, but for Defendants' misconduct.

84.     Defendants understood, accepted, and retained the benefits conferred by Plaintiffs and the other members of the Class.

85.     It would be inequitable and unjust for Defendants to retain the benefits of their misconduct, including the net interest income they earned at the expense of their own clients.

86.     Plaintiffs and the other members of the Class suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the profits unjustly obtained by Defendants, plus prejudgment interest on those amounts.

## COUNT THREE

### Breach of Contract
### Brought on behalf of the Retirement Plan Subclass Against All Defendants

87.     Plaintiffs, individually and on behalf of the Retirement Plan Subclass, hereby re-allege the allegations set forth above as if fully set forth herein.

88.     The Charles Schwab agreements for its investment accounts offered and provided to members of the Retirement Plan Subclass are a valid and binding contract between Charles Schwab and its accountholders.

89.     The governing documents require Charles Schwab to pay "Retirement and benefit plan accounts . . . a reasonable rate consistent with applicable legal and regulatory requirements."

90.     Charles Schwab breached the terms of its agreements with Plaintiffs and the Retirement Plan Subclass because Charles Schwab did not pay its customers a reasonable rate of interest on their cash deposits.  Charles Schwab further extracted for itself unreasonable interest rate payments and fees from Charles Schwab's affiliated banks.

91.     Plaintiffs and the members of the Retirement Plan Subclass suffered financial harm from the Defendants' misconduct, and they are entitled to damages from the Defendants, plus prejudgment interest thereon.

## COUNT FOUR

**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**Brought on behalf of the Non-Retirement Plan Subclass Against All Defendants**

92.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

93.     Charles Schwab accountholders entered into a written contract with Charles Schwab—the terms of which are contained in and incorporated into various standardized documents drafted by Charles Schwab, including the Cash Features Disclosure Statement.  These documents were and are, for all purposes relevant hereto, contracts between the accountholders and Charles Schwab.

94.     Plaintiffs and members of the Non-Retirement Plan Subclass paid valuable consideration in exchange for these contractual rights.

95.     Inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Charles Schwab to deal fairly with Plaintiffs and other accountholders, to fulfill their obligations to Plaintiffs and Non-Retirement Plan Subclass members in good faith, and to not deprive Plaintiffs and Non-Retirement Plan Subclass members of the fruits of their bargain.

96.     By failing to pay Plaintiffs and the Non-Retirement Plan Subclass members a reasonable rate of interest, Charles Schwab breached the implied covenant of good faith and fair dealing inherent in the contracts.  Through the implied covenant of good faith and fair dealing, Charles Schwab was obligated to pay Plaintiffs and the members of the Non-Retirement Plan Subclass a reasonable rate of interest.  By failing to do so, Charles Schwab violated the reasonable expectations of the members of the Non-Retirement Plan Subclass.

97.     Plaintiffs and the other members of the Non-Retirement Plan Subclass suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing, and they are entitled to damages from the Defendants, plus prejudgment interest thereon.

## COUNT FIVE

### For Gross Negligence
### Brought on Behalf of the Class Against All Defendants

98.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

99.     As set forth above, Defendants owed fiduciary duties to Plaintiffs and the other members of the Class in the operation of the Charles Schwab Cash Features Program.

100.    Defendants breached their duties to Plaintiffs and the Class by acting in their own best interest to the detriment to Plaintiffs and the Class, which included failing to pay a reasonable rate of interest on customers' Charles Schwab cash sweep account balances.

101.    Defendants' misconduct was grossly negligent because it comprised a reckless disregard for Charles Schwab's clients' best interests, and represented an extreme departure from the ordinary standard of care.

102.    Defendants' misconduct directly and proximately caused financial harm to Plaintiffs and the other members of the Class.  As a result, Plaintiffs and other Class members are entitled to damages from the Defendants, plus prejudgment interest thereon.

## VII.  DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, demand judgment and relief as follows:

103.    For an order certifying the proposed Class and Subclasses, and appointing Plaintiffs and Plaintiffs' counsel to represent the proposed Class and Subclasses;

104.    For an order awarding Plaintiffs and Class and Subclass members damages in an amount to be proven at trial, together with pre-trial and post-trial interest thereon;

105.   For an order awarding Plaintiffs and Class and Subclass members restitution, disgorgement, or such other and further relief as the Court deems proper; and

106.   For an order awarding Plaintiffs and the Class and Subclass reasonable attorneys' fees and costs of suit, including expert witness fees.

## VIII. JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of the Class (including the Retirement Plan and the Non-Retirement Plan Subclasses), demand a trial by jury on all issues so triable.

Dated:  September 30, 2024

Respectfully submitted,

*/s/ Jonathan D. Uslaner*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

Salvatore J. Graziano (*pro hac vice* forthcoming)
John Rizio-Hamilton (*pro hac vice* forthcoming)
Avi Josefson (*pro hac vice* forthcoming)
Adam Wierzbowski (*pro hac vice* forthcoming)
Michael D. Blatchley (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
salvatore@blbglaw.com
johnr@blbglaw.com
avi@blbglaw.com
adam@blbglaw.com
michaelb@blbglaw.com

-and-

**BUZIN LAW, P.C.**
Robert J. Jackson, Jr. (*pro hac vice* forthcoming)
3003 Purchase Street
P.O. Box 529
Purchase, New York 10577

Tel: (212) 879-8100
robert.j.jackson@nyu.edu

*Counsel for Plaintiffs and the Proposed
Class and Subclasses*